We'll hear the first case, Galin. Good morning, Your Honors. May it please the Court, Richard Altman for Reed-Galin. The issue in this case is the scope of the entrustment doctrine under the UCC, and in this diversity case, the laws of the State of New York are, and the interpretation of that statute is what's at issue here. The district court correctly ruled initially that this was an affirmative defense, and the burden of that affirmative defense was properly, at the outset, placed on Mr. Hamada. Can you, if I can ask you at the outset, if you can point to any case assessing red flags where the red flags were not at the initial sale, but at a subsequent sale? Well, I would, Your Honor, take issue with your characterization that there were no red flags at the initial sale. But I would suggest that the leading case here is Porter v. Wirtz from the New York Court of Appeals, which does lay out some of the aspects of red flags. It's our view here that entrustment, the scope of entrustment, is generally an issue of fact and requires full discovery. But even in this case — You jumped the entrustment issue on the first transaction in 1989, and your entire blue brief focused on the later transaction. Why are you passing by, at least in the first instance, the 89 transaction? We didn't pass it by, Your Honor. I believe it was mentioned, but not in the greater — it was mentioned to a greater extent in the reply brief. But the point is that there were issues in the 1989 transaction which made it — I mean, but do you take issue with the district court's holding that if the entrustment provision applies to the 89 transaction, it doesn't matter what happened after that? No, I don't. I do take issue with that because you cannot — It is not the law that anyone who's downstream from a first sale by, let's say, by a thief or by someone to whom property is entrusted, it is not the law that no one downstream has any obligations. We're talking here about, perhaps, we don't know, but perhaps an art dealer merchant purchaser. And as the New York cases — to the initial sale. No. The cases — the district courts in Bender v. Carroll, for example, and in the Overton case, those cases stand for the proposition that merchant purchasers downstream have their own obligations of due diligence. No one can simply close their eyes and say, well, I just bought this, and therefore I have title. So the district court here defined the scope of entrustment, I think, much too narrowly. In Davis v. Carroll, I think Judge Etkin had it — got it right. He said basically — which was a summary judgment motion after full discovery. If what you say is right, isn't the entrustment provision undermined? I mean, the point is if a merchant purchases, then that gives clean title thereafter, unless, of course, some other issue arises. But on your theory, then that's not true. No, that's not — that's not quite what my position is. My position is that a downstream purchaser cannot merely say that there were no issues and therefore — since — that it was sold, and therefore I now own it. The issue of entrustment is — And what case stands for that proposition? The ones I just mentioned, Your Honor. Judge Etkin's decision in Davis v. Carroll and the Porter v. Wirtz decision from the New York Court of Appeals, Bender against Carroll, and the Overton case also. What about — in terms of citations to the record, if you could help me, where, besides your client's declaration, is there evidence that the Benson painting was not worth — I guess it was $819,000 in late 1989. Where can we find that? If you'll give me a moment, please. I'm sorry. Or you can, you know, when you come back on rebuttal, you can look it up. It's not handy. There were citations to prior sales of Benson paintings, which seemed to indicate that the price for the Benson was considerably inflated. Could you, you know, when you come back, can you just point us to some citations to the record? Yes, Your Honor, I will. And you say that Ramos overpaid for Ice Storm. What is the evidence that the second-highest auction bid was much less, significantly less than the $819,000? I'm sorry. Could you repeat your question, please, Your Honor? What's the evidence that the second-highest auction bid was significantly less than the $819,000? There were pre-auction estimates in the 1989 catalog. If you can, when you come back, if you can cite to the record where we can find that, that would be very helpful. All right. What the amount of the second-highest bid was, what that amount was, I'd be interested in that. All right. I will see. When I come back, I will say that. Thank you. All right. Thank you. Good morning. David Feig on behalf of non-party appellant Mr. Altman. May it please the Court. Let me say at the outset, Your Honor, that it is our position that O'Brien v. Alexander does indeed make clear that there is a continuing obligation under the 93 amendments to Rule 11, and that sanctions indeed may be imposed under that provision. That Starmark contemplates a notice requirement, which was amply complied with here through opposing counsel's regular and consistent threats of sanctions. And that Story, which is perhaps the best guide here, makes clear that the standard here is that something must be utterly lacking in support. That said, it is our position that the sanctions in this case have to be reversed, as the O'Brien standard hasn't even been close to being met. Judge Furman indicated in his order that there was no admissible evidence whatsoever to support Galen's assertion that there were red flags surrounding the transfer of the painting from Ramis to Coe Kerr. And I understand that you're interested in the 1989 sale, so I'd like to address two facts that are indeed admissible and, I would argue, in fact, dispositive of this case. The first comes from the deposition, the deposition, the otherwise contentious deposition of Ramis, where he admits for the first time indeed that he was a daily heroin user, indicates that he had bottomed out only a month before this transaction, and on page 39 of his deposition, describes his addiction and says the world seemed to be falling in on me. I was dancing as fast as I could. I don't even remember doing a deal with Coe Kerr. Then he goes on to indicate that— What is the evidence to show that Coe Kerr knew all of that? That's a great question, Judge Chin, and what I would say to that is that it is an objective, not a subjective standard, and that we know that, or at least that is strongly indicated by Judge Etkin, who does an exhaustive analysis in Davis v. Carroll and indicates, citing Porter v. Wirtz and a Yale Law Review article, that the purchaser— What I'm saying, Your Honor, is that Judge Etkin indicated that even if—that a purchaser will be deemed to lack good faith if facts about the transfer is fraught about, even if proof is lacking, that the purchaser was aware of the fraud. That is to say, it is an objective, not a subjective standard. So even the unconvincing denials— Objectively speaking, what is the evidence that Coe Kerr— In this case, we were unable—in this case, because of the severe discovery limitations, we were unable to develop that particular part of the record, but I would say— It looks like the answer is there isn't anything. There isn't—there is—there are merely—there are merely denials at this point. That said, it seems a perfectly reasonable—a perfectly reasonable belief, view of the evidence, that someone who was at the bottom of a heroin addiction at the time was subsequently indicted for fraud, which took place at the very time of this transaction, who admits that he indeed partied regularly, and in fact, it's important that we look at what he said about that, which is I would be goddarn shocked if people didn't know I was partying pretty hard. But if we disagree with you, if we were to disagree with you that the district court erred in limiting discovery, wouldn't that be some justification for imposing sanctions? No, insofar as Ramis himself indicates he would be goddarn shocked if everybody didn't know, and admits that he was, in fact, partying hard with people in the art world, and— In fact, people in the art world were partying hard. It suggests that they were committing crimes or didn't have money. No, but I would argue that a heroin user, a daily heroin user who was about to bottom out, who was partying hard and indicates he would be goddarn shocked if everybody didn't know it, is enough to draw a reasonable inference that that may have raised a red flag, especially in combination with the subsequent indictment that specifically involves fraud in this time period and the other one which I didn't get to, which is the provenance, also produced in discovery, which indicates that Coker was the only owner, and that is on page 236 of the appendices. Thank you. You're welcome. May it please the Court, John Cahill for the appellee, Kunetake Hamada, and good morning. I don't know where to begin other than to—I can address a couple of the Court's questions. Porter B. Wertz and Overton case, which I litigated, the Overton case, all involved actual red flags, not the perception of red flags, and there is no evidence in the record that whether he was partying hard, which again being before the Second Circuit and saying those words as a basis for invalidating a commercial transaction is hard to believe, is true or not. There is absolutely no evidence that in 1989 when this transaction occurred that there was any financial difficulties or any of the red flags that courts have set forth that are sufficient to invalidate a case that proceeds under the entrustment doctrine. What about the point about the provenance? The point about the provenance is not only a misapprehension. I believe it is factually false. The provenance of the work does not involve Coker. The plaintiff actually pleads in his complaint that Frederick Church was the owner and sold it to Coker and purchased it from Coker. It's the subject of our Rule 38 motion that that issue was raised for the first time on reply, and in our Rule 38 motion we attached the documents that were produced by Christie's pursuant to a subpoena, which we actually thought went beyond the scope of discovery. Why does the provenance of the 1989 Christie's auction just list Coker? Why doesn't it also list Frederick Church? It's common for two reasons, and I've worked in-house at an auction house, and one of my longtime clients is Sotheby's, so I do know how this works. One is auction houses disclaim things like condition and provenance because it's hard to find out, particularly with paintings, so they don't necessarily put in all the paintings, so they often don't know all the provenance because they don't know. And second, it's not uncommon for the consigner, the owner, to not wish that his or her name be placed in the provenance because he or she does not want people to know that he or she is selling an artwork, so it's not at all uncommon for that to be the case. And we do have, thanks to the subpoena served by the appellant, we actually have the consignment agreement to Christie's, which is from one Frederick Church, not from Coker, and the idea that Coker was the owner is really, there's no evidence for it whatsoever. The evidence is the contradictory, it's nothing more than a conspiracy theory that makes absolutely no sense that Coker would consign it and then buy it back at a higher price. Particularly when it's here, the pleading also says there was a question about the price of the vengeance. It's also pled that the Wyeth painting was traded for a more valuable painting. So we think there is... Is there any question as to the provenance? There is no question. There's nothing in the record that suggests that there is a question as to provenance. There's nothing in the record that suggests that however Mr. Ramis spent his social life, that he had financial difficulties in 1989. The documents show that the painting sold for more than its purchase price when he sold it to Coker at Christie's. The question was asked also, since I'll give you auction trivia, about the second bid. There's no evidence in the record about what the bidding was. The fact that there were auction estimates merely means that that's the price the auction house said, we think it might sell for this in the fine print, but we don't know. The actual bid is not in the record. It wouldn't be in the record. But, again, the auction houses generally try to skew the estimates lower so that people will bid, and they don't go by double. They generally go in increments of, depending on the price, 5,000, 10,000, 20,000, 50,000, 100,000. We don't know even whether there were any other bids. No, exactly. And you shouldn't take my word for it. But it would be unlikely that the sole bid would be way above that estimate. Correct. Correct. The law prohibits the auction house from taking a bid that's lower than the low estimate, but it's very unlikely that the auction house would go from the estimate and then go double would be the next estimate from Coker. So there's no estimate. There's no evidence at all for that. And, frankly, there's no evidence, as Judge Furman explained very carefully in his decision. We thought there was no evidence in the complaint because of the pleadings I just mentioned. The judge, and there are cases, including the Brown case, which we cited, in which cases have just been dismissed as a matter of law because the entrustment doctrine is very clear.  And then when the discovery, which was extensive, and they got to speak to the people actually involved in the transaction, revealed that there was nothing wrong here. There were no red flags, as there were in Port of E. Wurtz, which involved a sale by a delicatessen employee of an old master painting, in Overton, which involved the sub-market sale to a loan-to-own lender. There was nothing like that here, and there was no evidence that in 1989 that anyone would know. And, in fact, Ramis testified, and it's in the record, that he did his very best to make sure people didn't know that he had any financial difficulties. And Mr. Galen is not merely a person who owned a third of the painting. He was his best friend. And after he was indicted, Mr. Galen himself, again, told People magazine that he just didn't believe that Galen could have done anything wrong. So this is a record on which it was clear to me from the beginning that there was no case as a matter of law. The judge, I think, reasonably said, I'm going to give you the benefit of the doubt. I'll give you discovery. But once discovery revealed nothing, and the appellant continued to advocate that in the face of no evidence at all, that the entrustment doctrine shouldn't apply, which is black letter law. I'm sorry, Your Honor. The entrustment doctrine is an affirmative defense. It is an affirmative. So you have the burden, right? Well, I know Judge Furman said that, and that's a point of view. I do respectfully disagree with that for three reasons. The first is, in this case, we had, after the litigation was filed, and again, it's put in as part of the Rule 38 motion, an agreement between the parties that the artwork would be sold and the proceeds would be paid to the winner. So we have an agreement that that's what would happen when there was a final order in the case. The second reason is that every plaintiff has the duty to show a prima facie case before the burden shifts to the other party. But even if the burden was on the defendant, the appellee here, it was more than met by the testimony of the parties to the transaction, both Mr. Adelson testifying on behalf of Coker and Mr. Ramis testifying as the seller, that there was nothing amiss here. They did these kinds of transactions all the time. That was unrebutted. That was complete. Unrebutted, except by what you would describe as speculation. Yes, not even less than speculation. There were also affirmative. It's really a conspiracy theory. It is that despite identifying who the consigner was and who the owner was, and knowing that, that something happened that's not on the record, that we all don't know about, that it must have been in the case. That's the entire reply brief. Your view is that we don't have to address whether or not this is an affirmative defense? That is my view, but my view is that even if it is an affirmative defense, it was more than met by both the lack of evidence in the record and the affirmative evidence that the sale price was pled to be of a higher value. It was sold to Coker for more than it was paid for at auction. And the fact that after the trade was made for the Benson painting, there was no evidence of financial distress because some number of hundreds of thousands was paid for the Benson painting by Remus. So there simply was no evidence, and there was plenty of evidence, that this was a standard commercial transaction between art dealers about whom in 1989, partying hard or otherwise, there was no evidence that anything was amiss. And Davis v. Carroll, Overton, Porter v. Worth, the red flags were bright red and very large for all different reasons here. Is it your view, I just want to be clear, that your adversary proceeded in bad faith? Or is it your view that your adversary is just a case of not up to standards lawyering? There's a difference between the two. There is. As we assess the question of sanctions. Yes, and regrettably, I think the standard under Rule 38, which is bad faith or akin to bad faith, is met here. And I say that because the motion to stay was based on an agreement that was signed. I say that because the argument made for the first time in reply, which is itself sanctionable, was based not on evidence, but evidence that he had that was to the contrary. I say that because Judge Furman took the time to carefully explain what was wrong with the law, that the pre-1993 law couldn't be cited, that the cases he cited wrongfully did that. There's no way to look at it that this was just a subjective thing. There were too many things and too many opportunities for the appellant to do the right thing, and he failed to do that. So I do think we meet the bad faith standard of Rule 38. My time is up. Thank you. Judge Katzman, the two record citations, I believe, are on page 285 and 294 and 295. That's regarding the evaluation of the Benson painting and the- Say those pages again. Pardon me? Would you repeat the pages? 285 and 294 to 295. We've heard here a series of factual issues which should have precluded summary judgment. As I mentioned, the Overton case before mentions four red flags that trigger- What was the answer to Judge Chin's question? The answer to Judge Chin's question was where were the valuations of the Benson painting. Am I correct? I had asked about the bid, but I understand from counsel that there is nothing in the record regarding the history of the bids. The history of the bids for Ice Storm, is that- Correct. Whether- No. All we know- That's correct, Your Honor. All we know is what Ramos paid for it, and we know that he had a prior- Presumably, common sense would tell you that there must have been a prior bid, because if this were the only bid, he wouldn't have bid double the high end of the estimate. That's not our contention. Our contention is that he had a deal with Christie's to pay this off in installments. I understand that's your contention. Is there any evidence to support that theory? That the bid for Ice Storm was higher, substantially higher, than the bids for other Wyeth paintings which were in that sale, and that's what's addressed at- That's your only evidence, and that's a 285. That's correct. That's correct. Had we been able to- Ice Storm is just not worth, compared to other Andrew Wyeth paintings, what it was eventually sold for. Our contention is that he overpaid for it because he had an understanding with Coe Kerr. That's correct. No, no, no, but your contention must also be that Ice Storm is just not so materially better than any other Andrew Wyeth painting that it's worth substantially more than the other Wyeth paintings listed on 285, right? There's nothing one way or the other in the record of- Did you have an expert say that? We were precluded from having any experts. All right. Did you have anybody say that? I had personal conversations with a couple of experts, but those are not evidence. The fact is that we were precluded. This case cries out for evidence, for expert witness testimony to analyze some of these factors. There are a lot of very strange- Ultimately, the argument relies on the limitation on discovery. A very large portion of our argument lies on the limitations of discovery. Yes, Your Honor, that's correct. We were precluded from witnesses. We were precluded from experts. We were precluded from- If we disagree with you about the propriety or impropriety of the limitation, then you would agree with me, I think, based on your answer just now, that it would be very difficult for you to prevail. Because you have no evidence. There is evidence- Besides your personal conversations that- No, I'm not offering those in front of this court. It's my contention that the deal with Coe Kerr- When you say contention, set aside your contention, give me some evidence. Just show me. I'm inviting you to show me something in the record. I've got to hear it. Ramis comes back with the ice storm six months after purchasing it. He goes back to Coe Kerr, and he gets the Benson painting, and he gets an IOU. He gives an IOU to Adelson for $450,000. Adelson says, I had some dealings with Ramis, but I didn't really know him that much. If I walked into an art gallery that didn't know me, and I asked for a loan of $450,000 unsecured, would they give it to me? I think not, and that's what happened here. So this is another red flag. He walks out with a painting which, it turns out, the Benson painting is also overpriced. It's a legitimate inference to say that the whole purpose of this deal was to increase the value of the ice storm, because the Coe Kerr gallery, which by the way was the exclusive dealer for Wyeth, that the Coe Kerr gallery had a buyer for the Wyeth, and they wanted to increase the price. I think that's a perfectly reasonable conclusion from the facts that we do have in the record. There's so many facts here which raise all kinds of issues. When Coe Kerr folded, all of its records went to the Frick Collection Library. Everything about Coe Kerr is in the Frick Collection Library, not this deal. There's a Wyeth Foundation in Pennsylvania which has records of Wyeth transactions. They have nothing about this deal. So it's not contention, and it's not merely speculation to question whether this deal was kosher, if you'll pardon the expression. There's something very strange about this, and we were barred from finding out what happened, not even to mention that we have no idea if Mr. Hamada even owns this painting. He never said one word under oath to say, I own this painting. So there are so many fact issues here that we feel that the district court just went a little far in granting summary judgment on this record. Thank you. If I may try to answer your question very specifically and simply say, if indeed you have to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought, then Mr. Cahill just demonstrated— You can slow down a little bit. Sorry. I'll give you more time. Okay. Mr. Cahill just demonstrated precisely why and how the facts should indeed be resolved in favor of the plaintiff here. He essentially, in response to your question, a good one, saying, how are we to interpret the provenance which only lists co-occur and does indeed provide significant evidence that indeed there was something abnormal about this sale? He's—Mr. Cahill essentially responded, not with the record, but by saying, look, I represent these folks. I know how this goes. Well, that may be the case, and it may not be the case. Is there anything in the record to show that not listing the earlier provenance is something that is indicative of wrongdoing? No. It's not indicative of wrongdoing. It is indicative of co-occur being the owner, and if co-occur is indeed the owner, then it is indeed strange that this is a circular sale. This is—it's not a conspiracy theory. It's there. So if indeed co-occur is the owner, and if indeed a drug-addled man who is subsequently convicted— The problem, though, it seems to me, is again a problem of a lack of record. Agreed, and— So his answer doesn't actually help you. It may not help him. It may not help you. So in response to that— Do you agree with that? Yes. Yes, and. I agree with that, and I believe it is indicative of precisely why Judge Furman, frankly, did not do as good a job as Judge Etkin in resolving very similar cases. And he did that by severely limiting the discovery, but— You also— I— Go back to the limitation of discovery. Ultimately, that's— That is a significant piece of it. That is a significant piece of it. But even in the absence of that, there are material facts which, if resolved in favor of the plaintiff, clearly lead straight down the road to red flags in the 1989 sale, among them this particular question of provenance which we've talked about. So essentially, yes, discovery is a problem, but also there are indeed facts adduced through the very limited discovery process which support the contention and allow facts to be drawn which would indeed raise red flags, which, as you well know, are not—is not an exhaustive category. So again, between the indictment, which clearly indicates he's engaged in precisely this kind of fraud at this time, between his admission of heroin—of essentially notorious heroin use daily at the time, between the admission that he bottomed out a month later, and the provenance, which only lists co-occur, those are all things that could very reasonably lead to inferences, if drawn in favor of the plaintiff, to a finding that there should have been red flags here, Your Honors.  So—okay. Thank you. Thank you all for your arguments, and the Court will reserve decision. Thank you.